UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
FEDERAL DEPOSIT INSURANCE CORPORATION,
in its capacity as Receiver of IndyMac Bank, F.S.B.,

                                      Plaintiff,                MEMORANDUM
                                                          OPINION AND ORDER

    - against-
                                                                     CV 10-656 (ETB)

AVRAHAM GLATTMAN, PETER MARCHELOS
and GROVER & FENSTERSTOCK, P.C.,

                                      Defendants.
----------------------------------------------------------------------X

       Before the Court is defendant Grover & Fensterstock, P.C.'s motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56, seeking to dismiss plaintiff's First Amended Complaint in its entirety. Plaintiff opposes the motion on the ground that material issues of fact exist, necessitating a trial by jury. For the following reasons, defendant's motion is granted in part and denied in part.

FACTS

       The plaintiff, the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as Receiver, commenced this action alleging that IndyMac Bank, F.S.B. ("IndyMac") was the victim of a purported fraudulent scheme involving mortgage loans issued in connection with the sale of ten residential properties. (Def. R. 56.1 Statement ("Def. 56.1") ¶ 1; Pl. R. 56.1 Statement ("Pl. 56.1" ¶ 1.) Former defendant Avraham Glattman[1] ("Glattman"), who is alleged

---

[1] By Stipulation of Partial Dismissal with Prejudice, the FDIC voluntarily dismissed its claims against Glattman in January 2012. (Docket Entry ("DE") #58.) The Court so ordered the stipulation of dismissal on January 18, 2012. (DE #59.)

-1-

to have orchestrated the fraudulent scheme, acted as a real estate broker in each of the ten transactions, through his real estate agency, 2000 Homes. (Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2.) Defendant Grover & Fensterstock, P.C. ("G&F") were engaged by IndyMac to serve as its settlement agent in connection with four of the ten transactions alleged to be fraudulent, identified as Property Nos. 5, 6, 9 and 10, all of which were consummated between May and August of 2007.[2] (Def. 56.1 3; Pl. 56.1 ¶ 3.)

In connection with G&F's role as settlement agent, IndyMac provided G&F a standard form eight-page document entitled "Closing Instructions," which G&F signed and agreed to abide by. (Def. 56.1 ¶¶ 17, 54; Pl. 56.1 ¶¶ 17, 54.) The Closing Instructions directed settlement agents to, <u>inter alia</u>, review all loan documents for accuracy and completeness, obtain the correct signatures of the mortgagors as required on all documentation, ensure accurate payoff information, that hazard, title and flood insurance was procured by the buyer and that all property taxes had been paid. (Def. 56.1 ¶ 18; Pl. 56.1 ¶ 18.) A settlement agent was expected to follow the Closing Instructions for each particular closing and to notify IndyMac of any inconsistencies that he or she may become aware of during a closing. (Gomez Dep. 23.)

During the course of a closing, the settlement agent would communicate with an IndyMac funder, who would make the final determination as to whether to fund a mortgage loan.[3] (Def.

---

[2] The FDIC is only seeking damages from G&F in connection with three of the four transactions - Property Nos. 5, 6 and 10. (Def. 56.1 ¶ 4; Pl. 56.1 ¶ 4.) Former defendant Peter Marchelos served as IndyMac's settlement agent in connection with two separate and unrelated transactions - Property Nos. 1 and 7. (Def. 56.1 ¶ 5; Pl. 56.1 ¶ 5.) The FDIC voluntarily dismissed its claims against Marchelos in April 2012. (DE #61.) The Court so ordered Marchelos's dismissal on April 13, 2012.

[3] It was the responsibility of IndyMac's underwriters to assess a borrower's ability to repay the loan by reviewing and analyzing the borrower's employment and income information.

56.1 ¶ 23; Pl. 56.1 ¶ 23.) The Closing Instructions instructed the settlement agent to fax a copy of the completed final HUD-1 Settlement Statement ("HUD-1") to an IndyMac funder for review prior to the disbursement of funds. (Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19.) G&F prepared and signed the HUD-1's for each of the loans at issue herein, representing that the HUD-1 was an accurate account of the loan transaction. (Def. 56.1 ¶¶ 55-56; Pl. 56.1 ¶¶ 55-56.)

In determining whether or not to fund a mortgage loan, the IndyMac funder reviewed the HUD-1 transmitted by G&F. (Def. 56.1 ¶ 24; Pl. 56.1 ¶ 24.) If changes needed to be made to a HUD-1 on the day of the closing, the settlement agent was expected to contact the funder. (Gomez Dep. 29.) If there was a discrepancy between the purchase price of a property and the information contained in the HUD-1, the IndyMac funder would not authorize the funding of the loan. (Wiley Dep. 19.)

An IndyMac funder would not verify whether the borrower remitted the correct down payment prior to funding the loan. (Wiley Dep. 20; Fensterstock Dep. 61.) Nor was the settlement agent required to send a copy of the borrower's down payment or any documentation establishing that a borrower had brought cash to the closing to the IndyMac funder. (Wiley Dep. 20-21; Trucksess Dep. 29-30; Gomez Dep. 111.) However, the Closing Instructions required the settlement agent to notify IndyMac "in writing[] if there [were] indications that funds to close or the earnest money deposit did not come from [the] [b]orrower." (Gomez Dep. 111; Def. Ex. J, No. 24; Def. Ex. K, No. 24.)

Once the IndyMac funder approved funding, the settlement agent was authorized to

---

(Def. 56.1 ¶ 14; Pl. 56.1 ¶ 14; Wiley Dep. 14.) Once a loan reached a funder's review, the borrower's ability to repay the loan had already been verified by IndyMac's underwriters. (Wiley Dep. 14.)

disburse the loan proceeds. (Def. 56.1 ¶ 20; Pl. 56.1 ¶ 20; Wiley Dep. 18; Fenstersock Dep. 27.) No funds would be disbursed without a final review and verification by the IndyMac funder that the information contained in the HUD-1 was correct. (Wiley Dep. 34-35.)

After the closing, the settlement agent would submit a package of closing documents back to the IndyMac funder for review. (Gomez Dep. 89-90.) With respect to each of the real estate transactions at issue herein, each of the IndyMac funders involved in those transactions completed and executed a "Funding Review Checklist," certifying that all necessary information and documents were reviewed and approved prior to the authorization to fund the loan. (Def. 56.1 ¶¶ 25-26; Pl. 56.1 ¶¶ 25-26.) IndyMac reserved the right to cancel its authorization to release the loan proceeds from G&F's attorney trust account. (Def. 56.1 ¶ 59; Pl. 56.1 ¶ 59.)

### A. The Subject Transactions

The FDIC commenced this action on February 16, 2010, in its capacity as Receiver for IndyMac, and moved to amend its Complaint on November 24, 2010. The motion to amend was granted, both on the merits and as unopposed, on January 26, 2011. The FDIC alleges that G&F committed legal malpractice and breached its fiduciary duties by failing to advise IndyMac of material information concerning the loan transactions and disbursing the loan proceeds without authorization. (1st Am. Compl. ¶¶ 121-26.) The FDIC further alleges that G&F breached their contract with IndyMac by failing to comply with IndyMac's Closing Instructions. (1st Am. Compl. ¶¶ 127-33.) G&F now seeks summary judgment on all of the causes of action alleged in the First Amended Complaint.

To avoid repetition, the specific allegations of breach/malpractice by G&F are discussed infra at pages 11 to 16.

1. The Rivers Transaction

On August 29, 2007, IndyMac authorized the funding of a mortgage loan to non-parties Maggie and Anthony Rivers ("Rivers") in the amount of $365,000 for the purchase of real property located at 114-03 Inwood Street, Jamaica, New York (referred to as "Property No. 5" in the First Amended Complaint). (Def. 56.1 ¶ 27; Pl. 56.1 ¶ 27.) Pursuant to the terms of the parties' contract, the purchase price for Property No. 5 was $406,000. (Def. 56.1 ¶ 28; Pl. 56.1 ¶ 28.) G&F acted as IndyMac's settlement agent for the Rivers Transaction and received authorization from IndyMac funder Barbara Trucksess to disburse the loan proceeds. (Def. 56.1 ¶ 29; Pl. 56.1 ¶ 29.)

Subsequent to IndyMac's approval and funding of the loan, Rivers defaulted on the mortgage payments, afer making only three monthly payments. (Def. 56.1 ¶¶ 33, 69; Pl. 56.1 ¶¶ 33, 69.) Property No. 5 is currently the subject of a foreclosure proceeding and as of October 25, 2011 was valued at $200,000. (Def. 56.1 ¶¶ 69-70; Pl. 56.1 ¶¶ 69-70.) On May 29, 2009, the Rivers mortgage loan was assigned to OneWest Bank, FSB. (Def. 56.1 ¶ 35; Pl. 56.1 ¶ 35.)

2. The Goodwin Transaction

On May 25, 2007, IndyMac authorized the funding of a mortgage loan to non-parties Yolander and Bracey Goodwin ("Goodwin") in the amount of $446,500 for the purchase of real property located at 110-21 156th Street, Jamaica, New York (referred to as "Property No. 6" in the First Amended Complaint). (Def. 56.1 ¶ 36; Pl. 56.1 ¶ 36.) Pursuant to the terms of the parties' contract, the purchase price for Property No. 6 was $470,000. (Def. 56.1 ¶ 37; Pl. 56.1 ¶ 37.) G&F was retained to serve as IndyMac's settlement agent for the Goodwin transaction and received authorization from IndyMac funder Anthony Wiley to disburse the loan

proceeds.  (Def. 56.1 ¶ 38; Pl. 56.1 ¶ 38.)

Subsequent to IndyMac's approval and funding of the mortgage loan, Goodwin defaulted on the mortgage payments.  (Def. 56.1 ¶ 39; Pl. 56.1 ¶ 39.)  Beginning in September 2010, Goodwin entered into a loan modification agreement with the FDIC, reducing the interest rate and monthly mortgage payments.  (Def. 56.1 ¶ 40; Pl. 56.1 ¶ 40; Pl. Ex. X.)

### 3. The Grecia Transaction

On August 24, 2007, IndyMac authorized the funding of a mortgage loan to non-party Carlisle Grecia ("Grecia") in the amount of $429,400 for the purchase of real property located at 116-49 227th Street, Cambria Heights, New York (referred to as "Property No. 10" in the First Amended Complaint.  (Def. 56.1 ¶ 45; Pl. 56.1 ¶ 45.)  Pursuant to the terms of the parties' contract, the purchase price for Property No. 10 was $452,000.  (Def. 56.1 ¶ 46; Pl. 56.1 ¶ 46.)  G&F served as IndyMac's settlement agent in connection with the Grecia transaction and received authorization from IndyMac funder Lisa DeSalis to disburse the loan proceeds.  (Dr. 56.1 ¶ 47; Pl. 56.1 ¶ 47.)

Subsequent to IndyMac's approval and funding of the mortgage loan, Grecia defaulted on the mortgage payments.  (Def. 56.1 ¶ 48; Pl. 56.1 ¶ 48.)  In 2009, Grecia applied for a loan modification with IndyMac due to financial hardship.  (Def. 56.1 ¶ 49; Pl. 56.1 ¶ 49.)  IndyMac denied Grecia's application.  (Def. 56.1 ¶ 49; Pl. 56.1 ¶ 49.)  In September 2010, Grecia entered into a loan modification agreement with the FDIC, reducing his monthly mortgage payments. (Def. 56.1 ¶ 50; Pl. 56.1 ¶ 50; Pl. Ex. O.)

DISCUSSION

I.      Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to establish the lack of any factual issues. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The very language of this standard reveals that an otherwise properly supported motion for summary judgment will not be defeated because of the mere existence of some alleged factual dispute between the parties. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Rather, the requirement is that there be no "genuine issue of material fact." Id. at 248.

The inferences to be drawn from the underlying facts are to be viewed in the light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). When the moving party has carried its burden, the party opposing summary judgment must do more than simply show that "there is some metaphysical doubt as to the material facts." Id. at 586. In addition, the party opposing the motion "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing there is a genuine issue for trial." Anderson, 477 U.S. at 248.

When considering a motion for summary judgment, the district court "must also be 'mindful of the underlying standards and burdens of proof' . . . because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." SEC v. Meltzer, 440 F. Supp. 2d 179, 187 (E.D.N.Y. 2006) (quoting Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir. 1988)) (internal citations omitted). "Where

the non-moving party would bear the ultimate burden of proof on an issue at trial, the burden on the moving party is satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim." Meltzer, 440 F. Supp. 2d at 187.

Summary judgment should not be regarded as a procedural shortcut, but rather as an integral part of the Federal Rules of Civil Procedure, which are designed to "secure the just, speedy and inexpensive determination of every action." Celotex, 477 U.S. at 327. Rule 56 must be "construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those persons "opposing such claims and defenses to demonstrate, . . . prior to trial, that the claims and defenses have no factual basis." Id. By its terms, Rule 56 does not require that a trial judge make any findings of fact. See Anderson, 477 U.S. at 250. The only inquiry to be performed is the determination of whether there is a need for trial. See id. The court's principal analysis on a motion for summary judgment is to ascertain whether there are any "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id

II.     The FDIC's Standing with Respect to the Rivers Transaction

In its moving papers, G&F argues that the FDIC lacks standing to litigate the Rivers Transaction because it did not own the Rivers mortgage at the time this litigation commenced. (Def. Mem. of Law in Supp. 24.) Rather, in May 2009 - nine months prior to the filing of this action - the Rivers mortgage was assigned to OneWest Bank, FSB, which, according to G&F, deprives the FDIC of standing to litigate with respect to the Rivers loan. (Id.; Furman Aff. Ex.

S.)

However, as the FDIC demonstrates in its opposition papers, G&F is incorrect.[4] After IndyMac's failure and the FDIC's subsequent assumption of receivership, the FDIC, as Receiver for IndyMac, sold certain of IndyMac's assets to an institution named IndyMac Federal Bank, pursuant to a Purchase and Assumption Agreement dated July 11, 2008. (FDIC Opp'n 19; see also http://www.fdic.gov/bank/individual/failed/IndyMac_Pand_A.pdf (copy of the Purchase and Assumption Agreement) (last visited July 12, 2012.)) As Section 3.4 of the Purchase and Assumption Agreement expressly states, certain of IndyMac's assets were not acquired by IndyMac Federal Bank under the Agreement. (Purchase and Asset Agreement, § 3.4, at p.15.) Specifically, IndyMac Federal Bank did not acquire "any interest, right, action, claim, or judgment against . . . (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank." (Id.)

Thereafter, in March 2009, IndyMac Federal Bank entered into a Loan Sale Agreement with OneWest Bank, FSB, under which it sold some of its assets to OneWest, including the servicing/foreclosure rights on many of IndyMac's loans. (FDIC Opp'n 20; see also http://www.fdic.gov/about/freedom/IndyMacLoanSaleAgmt.pdf (copy of the Loan Sale Agreement) (last visited July 12, 2012.)) One of the loans included in the sale was the Rivers loan, as evidenced by the assignment that was recorded on May 29, 2009. (Furman Aff. Ex. S.) However, as the FDIC points out, since IndyMac Federal Bank never acquired the rights to sue

---

[4] The Court notes that G&F does not address this issue in its Reply Memorandum of Law.

on IndyMac's loans, it could not have assigned those rights to OneWest.

Accordingly, the FDIC has standing to litigate the Rivers Transaction.

III.  Legal Malpractice

The FDIC alleges that G&F committed legal malpractice by failing to exercise due diligence in conducting the Rivers, Goodwin and Grecia closings, in that they failed to advise IndyMac of certain material information concerning the loan transactions and disbursed the loan proceeds without authorization. (1st Am. Compl. ¶¶ 122, 124.) The specific instances of misconduct attributed to G&F are discussed infra.

In a diversity action, such as this one, New York's law of legal malpractice applies. See Diamond v. Sokol, 468 F. Supp. 2d 626, 632 (S.D.N.Y. 2006) (citing Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 n.2 (2d Cir. 2006)). To succeed on a claim of legal malpractice under New York law, plaintiff must prove each of the following elements: "(1) the negligence of the attorney; (2) that the negligence was the proximate cause of the loss sustained; and (3) proof of actual damages." Baker v. Dorfman, 239 F.3d 415, 420 (2d Cir. 2000) (citations omitted); see also Ocean Ships, Inc. v. Stiles, 315 F.3d 111, 117 (2d Cir. 2002) (describing the elements as "(1) a duty, (2) a breach of the duty, and (3) proof that the actual damages were proximately caused by the breach of the duty."). "A prima facie case of legal malpractice requires a showing that the attorney failed to exercise that degree of skill commonly exercised by an ordinary member of the legal community, and that the client incurred damages as a direct result of the attorney's actions." Sohns v. Little Prince Prods., Ltd., 791 F. Supp. 88, 93 (S.D.N.Y. 1992) (citing Marshall v. Nacht, 569 N.Y.S.2d 113, 114 (2d Dep't 1991)).

"[A]n error of judgment by an attorney does not rise to the level of malpractice." Achtman, 336 F. Supp. 2d at 339 (citing Rosner v. Paley, 65 N.Y.2d 736, 738 (1985)). Nor does "selection of one among several reasonable courses of action . . . constitute malpractice.'" Rosner, 65 N.Y.2d at 738 (citations omitted). "An attorney is not held to the rule of infallibility and is not liable for an honest mistake of judgment, where the proper course is open to reasonable doubt." Achtman, 336 F. Supp. 2d at 340 (quoting Bernstein v. Oppenheim & Co., 554 N.Y.S.2d 487, 489 (1st Dep't 1990)). However, if an attorney "negligently or willfully withholds from his client information material to the client's decision to pursue a given course of action, or to abstain therefrom, then the attorney is liable for the client's losses suffered as a result of action taken without benefit of the undisclosed material facts." Spector v. Mermelstein, 361 F. Supp. 30, 40 (S.D.N.Y. 1972).

"[W]hether malpractice has been committed is normally a factual determination to be made by the jury." Diamond, 468 F. Supp. 2d at 634 (quoting Corley v. Miller, 520 N.Y.S.2d 21, 23 (2d Dep't 1987)). Where the plaintiff has demonstrated "sufficient evidence" that a reasonable factfinder, drawing all inferences in plaintiff's favor, could find the elements of a malpractice claim have been met, plaintiff is "entitled to proceed to trial, no matter how strong or weak [the] case may seem to the Court." Diamond, 468 F. Supp. 2d at 634.

A.  The Rivers Transaction

The First Amended Complaint contains the following allegations with respect to the Rivers Transaction: (1) that the sales contract required the buyer to make a down payment of $20,300 but Rivers neither made the deposit nor did she bring cash to the closing, even though the HUD-1 states she did; (2) that G&F read or should have read the sales contract and knew or

-11-

should have known that it was not bona fide because no bank would provide a purchase money loan in an amount greater than the buyer's need; (3) that G&F knew or should have known that the HUD-1 did not follow the contract provisions concerning the credit terms; and (4) that G&F knew or should have known that the Rivers loan was a sham transaction and failed to notify IndyMac of material facts, proceeding with the closing instead. (1st Am. Compl. ¶¶ 86-90.)

G&F argues that the FDIC's allegations are unsubstantiated because by letter dated August 23, 2007, the attorney for the seller in the Rivers Transaction, Dean Mavrides, confirmed that he was holding $20,300 in escrow that would be credited to the seller at the time of closing. (Furman Aff., Ex. Q.) G&F asserts that a check in that amount was presented at the closing of the Rivers Transaction. (Def. Mem. of Law in Supp. 11; Furman Aff., Ex. R.) G&F further argues that the Closing Instructions do not require the closing agent to verify a borrower's down payment or to review the contract of sale for credit terms. (Def. Mem. of Law in Supp. 15; Furman Aff., Ex. G.) According to G&F, it is the underwriters' responsibility to examine the contract of sale. (Def. Mem. of Law in Supp. 18-19; Furman Aff., Exs. F, L, AA.)

Conversely, the FDIC argues that although the Closing Instructions directed G&F to strictly follow the HUD-1, G&F failed to comply with its representations on the Rivers HUD-1. (Pl. Mem. of Law in Opp'n 11.) Specifically, the FDIC asserts that while the HUD-1 for the Rivers loan reflects a disbursement of $50,600 as a payoff of a second mortgage loan, no such disbursement occurred. (Id.; Fensterstock Aff., Ex. AB; Weinstein Decl., Ex. F.) According to the FDIC, G&F made other disbursements, not disclosed on the HUD-1, including $10,000 to Joseph DeGaetano, as attorney for Rivers, $1,550 to DeGaetano personally, $2,000 to an individual named Guy Levy, and $550 to the title closer, Anthony Saravo. (Pl. Mem. of Law in

Opp'n 11-12; Weinstein Decl., Ex. F.) The FDIC asserts that G&F failed to notify IndyMac about any of these disbursements, and that such funds were disbursed without authorization, in violation of the Closing Instructions. (Pl. Mem. of Law in Opp'n 12.) Finally, the FDIC argues that discovery revealed two different versions of the Rivers contract of sale, one demonstrating a down payment by Rivers in the amount of $20,300 and the other denoting a $5,000 down payment. (Furman Aff., Ex. P; Weinstein Decl., Ex. G.)

Having reviewed the evidence submitted by both sides, the Court finds that a genuine issue of material fact exists with respect to whether G&F committed malpractice in connection with the Rivers Transaction. Accordingly, summary judgment is denied.

B. The Goodwin Transaction

The FDIC alleges the following with respect to the Goodwin Transaction: (1) that there were inconsistencies on the HUD-1 in the amount of $110,000 with respect to the sales price of the property; (2) that there was no credit of Goodwin's down payment; (3) and that G&F knew or should have known that the Goodwin loan was a sham transaction and failed to notify IndyMac of material facts, instead proceeding with the closing. (1st Am. Compl. ¶¶ 83-84.)

G&F acknowledges that the HUD-1 that was initially sent to IndyMac during the Goodwin closing contained inconsistent sales price information, but argues that an amended HUD-1 was remitted following the closing, which contained the correct sales price and was designated as the "Final HUD." (Def. Mem. of Law in Supp. 13; Furman Aff., Ex. V; Fensterstock Aff. ¶ 13.) G&F further argues that "a plain review of the HUD-1 Statement reveals a $5,000 down payment" by Goodwin. (Def. Mem. of Law in Supp. 13.)

In response, the FDIC asserts that while the Goodwin HUD-1 demonstrates that 2000

Homes, the real estate broker, received $20,000 for it brokerage commissions, G&F actually disbursed $18,404 to 2000 Homes, without any explanation to IndyMac. (Pl. Mem. of Law in Opp'n 12; Weinstein Decl., Ex. T.) The FDIC further asserts that G&F also disbursed $1,500 to Joseph DeGaetano and $1,100 to David Spiegelman, none of which is documented on the HUD-1. (Pl. Mem. of Law in Opp'n 12; Weinstein Decl., Ex. T.) The FDIC also asserts that discovery revealed two different versions of the Goodwin sales contract, the first containing a sales price of $470,000 and the second containing a sales price of $445,000. (Weinstein Decl., Exs. P, Q.) The FDIC argues that the Goodwin loan was approved based on a $470,000 purchase price, but it is unclear which price is actually the correct one. (Pl. 56.1 ¶ 44.) According to the FDIC, "G&F did not even bother to look at the HUD-1 before disbursing the loan proceeds, as the HUD-1 contains an incorrect purchase price and amount due to seller resulting from an error G&F made in preparing it," which was only discovered after the closing. (Pl. Mem. of Law in Opp'n 12.)

Having reviewed the evidence submitted by both sides, the Court finds that a genuine issue of material fact exists with respect to whether G&F committed malpractice in connection with the Goodwin Transaction. Accordingly, summary judgment is denied.

    C.    <u>The Grecia Transaction</u>

The First Amended Complaint contains the following allegations with respect to the Grecia Transaction: (1) that G&F knew or should have known that the sales contract was not bona fide; (2) that G&F knew or should have known that the HUD-1 did not follow the contract provisions concerning credit terms; (3) that Grecia neither made a down payment nor brought cash to the closing, even though the HUD-1 states he did; and (4) that G&F knew or should have known that the Grecia loan was a sham transaction and failed to notify IndyMac of material facts,

proceeding with the closing instead. (1st Am. Compl. ¶¶ 103-06.)

G&F asserts that Grecia testified at his deposition that he made a $3,000 down payment, as provided for in the contract of sale, and that he brought a certified check from Citibank in an amount exceeding $20,000 to cover any additional closing costs. (Grecia Dep. 27, 39-41.) However, G&F omits that portion of Grecia's deposition testimony wherein he stated that it was not until two days before the closing that he learned he needed to bring an additional $27,000 to the closing; money that Grecia did not have. (Grecia Dep. 39-40.) Grecia further testified that just prior to the closing, a real estate agent from 2000 Homes handed him a large sum of cash and took him to Citibank and directed him to use the money to purchase a certified check. (Grecia Dep. 40-41.) Finally, Grecia testified that during the closing, and in G&F's presence, he voiced serious concerns regarding the validity of the mortgage loan and his ability to repay it. (Grecia Dep. 31, 39-40, 49-50.)

The FDIC also asserts that, as with the Rivers and Goodwin loans, G&F disbursed loan proceeds from the Grecia Transaction to persons not listed on the HUD-1 as follows: (1) $7,000 to Paddington Associates; (2) $1,250 to Joseph DeGaetano; and (3) $1,250 to Jason Oshins, the attorney for Grecia. (Weinstein Decl., Exs. B, M.)

Having reviewed the evidence submitted by both sides, the Court finds that a genuine issue of material fact exists with respect to whether G&F committed malpractice in connection with the Grecia Transaction. Accordingly, summary judgment is denied.

Based on the foregoing, the Court finds that there are genuine issues of material fact concerning whether G&F committed legal malpractice as alleged by the FDIC. Accordingly, G&F's motion for summary judgment is denied as to the legal malpractice claim.

IV. The Remaining Claims

The FDIC also alleges that G&F breached its contract with the FDIC (e.g., the Closing Instructions), as well as its fiduciary duty as the FDIC's closing agent. According to the FDIC, G&F committed these breaches by: (1) closing the Rivers, Goodwin and Grecia loan transactions where the settlements were not in compliance with the HUD-1; (2) failing to advise IndyMac of certain material information concerning the loan transactions; and (3) disbursing the loan proceeds without authorization. (1st Am. Compl. ¶¶ 124, 130-32.) G&F argues that the breach of contract and the breach of fiduciary duty claims are duplicative of the legal malpractice claim and therefore, must be dismissed.

With respect to the breach of fiduciary duty claim, the FDIC acknowledges in its opposition papers that where "a plaintiff asserts both a legal malpractice claim and a breach of fiduciary duty claim against an attorney, New York courts typically dismiss the breach of fiduciary duty claim as duplicative of the malpractice claim." Sheehy v. New Century Mortgage Corp., 690 F. Supp. 2d 51, 63 (E.D.N.Y. 2010) (citing cases); see also Pl. Mem. of Law in Opp'n 15 ("G&F is correct in arguing the malpractice and fiduciary duty claims are redundant."). Accordingly, G&F is entitled to summary judgment on the breach of fiduciary duty claim and the claim is dismissed.

The FDIC opposes G&F's claim, however, that the breach of contract claim is duplicative and should be dismissed as such. "[A] claim for breach of contract is properly dismissed as 'redundant . . . of a malpractice claim,' where it does not 'rest upon a promise of a particular or assured result,' but rather upon defendant's alleged breach of professional standards." Diamond, 468 F. Supp. 2d at 35 (quoting Senise v. Mackasek, 642 N.Y.S.2d 241, 242 (1st Dep't 1996)); see

also Schweizer v. Mulvehill, 93 F. Supp. 2d 376, 398 (S.D.N.Y. 2000) (stating that where a breach of contract claim "is nothing but a redundant pleading of a timely malpractice claim, it should be dismissed as duplicative").

As stated above, the First Amended Complaint alleges that G&F breached the Closing Instructions by, inter alia, closing the loan transactions where the settlements were not in accordance with the HUD-1. (1st Am. Compl. ¶ 130.) The FDIC argues that, pursuant to the Closing Instructions, G&F "promised to provide IndyMac with a fully compliant HUD-1," and that by failing to do so, G&F breached the Closing Instructions. (Pl. Mem. of Law in Opp'n 16.) However, as G&F points out in its Reply Memorandum of Law, the FDIC has failed to produce any evidence to demonstrate that G&F made any express promise to IndyMac that was separate and distinct from its implied promise to use due care in its capacity as IndyMac's settlement agent. (G&F Reply Mem. of Law 9.) The allegations underlying both the malpractice claim and the breach of contract claim "require identical proof of a deviation from the professional standard of care in the community, causation, and damages," and as such, the breach of contract claim "is duplicative of plaintiff's allegations of malpractice." Schweizer, 93 F. Supp. 2d at 398 (dismissing breach of contract claim); see also Diamond, 468 F. Supp. 2d at 640-41 (dismissing breach of contract claim as duplicative of malpractice claim where plaintiff did not allege that defendant promised "a particular result," rather than simply undertaking to represent plaintiff). Accordingly, the breach of contract claim is dismissed.

For the foregoing reasons, G&F's motion for summary judgment with respect to the breach of fiduciary duty and breach of contract claims is granted and those claims are dismissed.

## Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted in part and denied in part. Specifically, summary judgment is granted with respect to plaintiff's claims for breach of contract and breach of fiduciary duty and those claims are dismissed. Summary judgment is denied with respect to plaintiff's claim for legal malpractice.

**SO ORDERED:**

Dated: Central Islip, New York
August 7, 2012

/s/ E. Thomas Boyle
E. THOMAS BOYLE
United States Magistrate Judge